Death Opinion







 

 


 





IN THE COURT OF CRIMINAL APPEALS

OF TEXAS






AP-74,446, AP-74,447, AP-74,448





 


RAPHAEL DEON HOLIDAY, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NOS. 10,423, 10,425, 10,427 IN THE 


278
TH JUDICIAL DISTRICT COURT OF MADISON COUNTY






 Keasler, J., delivered the opinion of the Court in which Keller, P.J., and
Meyers, Price, Hervey, Holcomb, and, Cochran JJ., joined. Johnson, J., concurred in
the judgments. Womack, J., filed a dissenting opinion. 



O P I N I O N


 

 Appellant Raphael Deon Holiday was charged and convicted of capital murder. (1) 
Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal
Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced Holiday to death. (2) 
Direct appeal to this Court is automatic. (3) Holiday raises forty-nine points of error. We
overrule each point of error and affirm his convictions and sentences.

Sufficiency of the Evidence

 In his first point of error, Holiday claims that the evidence is legally insufficient to
support his convictions for capital murder. He argues that the State has not proven intent or
knowledge because the evidence does not support a finding that the fire that caused the
victims' deaths was started by Holiday. For the same reason, in his second point of error,
Holiday claims that the evidence is factually insufficient.

 Tami Lynn Wilkerson and Holiday lived together in a log house that Wilkerson's
stepfather had built in Madison County. The house was in a secluded, wooded area about
ten miles off the main highway, but just a mile or two from the home of Wilkerson's mother,
Beverly Mitchell. Wilkerson and Holiday lived with Wilkerson's two daughters, seven-year-old Tierra and five-year-old Jasmine, and with Wilkerson's and Holiday's baby, Justice. In
March of 2000, Wilkerson learned that Holiday had sexually assaulted Tierra. Wilkerson
filed charges against Holiday and obtained a protective order against him. Wilkerson
continued to live in the house in Madison County and Holiday moved out. In the following
months, Holiday repeatedly contacted Wilkerson by phone, stating that he wanted to
reconcile and that he wanted to see Justice, and threatening to come to the house while the
children were at home. Despite the protective order, Wilkerson met with Holiday numerous
times between April and the end of August, in an effort to "handle" Holiday and deal with
his threats, and to allow him to see Justice. In August, Holiday came to the restaurant where
Wilkerson was working. Wilkerson locked herself in the office. When Holiday tried to pick
the lock on the office door, Wilkerson called the police, who came and removed Holiday
from the premises. About a week before the instant offenses, Holiday called Wilkerson and
asked for her help in jumping his car. When Wilkerson arrived to assist him, Holiday took
her keys, told her he had two guns, forced her to have sex with him, and then forced her into
the car and threatened to crash the car and kill them both. Wilkerson finally convinced
Holiday to let her go. After that incident, Wilkerson stopped taking Holiday's phone calls.

 Around 11 p.m., on the evening of September 5, 2000, one of Wilkerson's daughters
heard glass breaking outside. Wilkerson looked out of the window and saw a figure walking
toward the house. She called her mother, Beverly Mitchell, and asked her to come over. 
Mitchell and Wilkerson's uncle, Terry Keller, soon arrived at Wilkerson's house. Keller had
a shotgun and began walking around the house and yard. Mitchell took Tierra and Jasmine
to her car. When she went back inside the house to get Justice, she picked up the telephone
to dial 911. As she was holding the phone, Holiday walked in, grabbed the phone out of her
hand, and threw it against the wall. When Wilkerson came into the room and saw Holiday,
she ran out of the house to go for help. Holiday asked Mitchell how she had known to come
to the house because Holiday said he had cut the phone line. Holiday said he was going to
make Wilkerson pay for what she had done by taking his baby away. When Keller came into
the house, Holiday held Mitchell in a head-lock with a gun to her head until Keller put his
gun down and Holiday retrieved it. Keller testified that Holiday began "ranting and raving"
that he was not "going to take the rap" on the charges filed against him, that he was "going
to take care of it," and that he was "going to burn the house down with everyone in it." 
Holiday then poured gasoline around and on the hood of the car where Tierra and Jasmine
were. He again said Wilkerson was going to pay for what she had done. He tried to light the
gasoline, but it would not ignite. Holiday forced everyone back into the house, shooting off
the guns as they went. He ordered everyone to sit on the couch and told them to stay there. 
He told Keller that if he left, he would kill Mitchell. Holiday made repeated threats to kill
everyone if the police came. He then ordered Mitchell to take him to her house to get some
more gasoline. They retrieved two five gallon cans of gasoline and returned to Wilkerson's
house. Keller was gone, but the girls were still on the couch. Holiday told Mitchell to
"soak" the recliner and furniture with the gas. Mitchell poured gas on the recliner in the
living room, poured it around the room, into the laundry room and around the washer and
dryer, and into and around Wilkerson's bedroom. She did not pour any gasoline on or around
the couch where the children were sitting. She saw Holiday bend down and then the fire
started. The fire followed the path of the gasoline, and blocked Mitchell from going back
into the living room for the children. Mitchell ran outside. Holiday was standing outside
watching the fire. He told Mitchell to get in the car, but she ran into the woods. Holiday left
in Mitchell's car as police were arriving. He rammed a police car and drove off.

 In the meantime, Wilkerson had run to the nearest neighbor's house for help. The
neighbors called 911. As Wilkerson ran back down the road to her house, she saw Mitchell's
car coming toward her. The car sped up and attempted to run her down but Wilkerson
escaped into the woods. The car backed up and sped off as it was pursued by a police car. 
When Wilkerson arrived back at her house, it was engulfed in flames. Wilkerson's three
children died in the fire.

 Holiday was apprehended by police after a high-speed chase. Holiday had two
cigarette lighters in his pocket when he was arrested. He was treated for burns on his arms,
hands, and face. Holiday's pistol and Keller's shotgun were found later inside the house.

 In the weeks before the offenses, Holiday stayed with his second cousin, Steven
Taylor. Taylor testified that Holiday talked to Wilkerson on the phone almost every day. 
Taylor once overheard Holiday tell Wilkerson that he would kill her if he did not get his
child; Holiday told Taylor he had been joking. Taylor's brother, Robert Lowery, and
Holiday's cousin, John White, rode with Holiday to Wilkerson's house around 9:30 on the
night of the offenses and dropped Holiday off. Holiday told them he would call in the
morning when he was ready to be picked up. Earlier on the day of the offenses, White sold
Holiday a gun, and they went to a cemetery for target practice. Holiday told Lowery and
White that he was worried and upset about the sexual-assault case pending against him, that
Wilkerson and her boyfriend were trying to set him up, and that they were lying about him
and trying to take his children away from him. Holiday told White that if you shoot someone
and then burn them, you won't get caught. He also told Lowery that he was going to burn
down Wilkerson's house and watch her run out.

 The State presented expert testimony that the burns on Holiday's right arm and face
were consistent with having reached down and ignited the fire. Additionally, a forensic
scientist who specializes in the investigation and reconstruction of fires and explosions
testified that the household appliances could be excluded as the ignition sources of the fire.

 Holiday argues that there is no evidence that he intentionally or knowingly started the
fire. He points out that Mitchell testified that she did not actually see him light the fire, that
there were other potential ignition sources such as household appliances, and that the
cigarette lighters found on him did not have traces of gasoline, or display other evidence of
burning. Holiday also contends that the evidence that he did not direct the gasoline to be
poured around the couch where the children were seated, that his gun was found inside the
burned house, and that he was not near an exit when the fire started, supports a conclusion
that the fire ignited accidentally, that Holiday dropped his gun in surprise and narrowly
escaped the blaze himself, and that he did not intend for the children to be burned.

 Viewed in a light most favorable to the verdict, the evidence is legally sufficient to
support a finding that Holiday acted intentionally or knowingly. (4) Holiday was worried and
angry about the sexual-assault charges against him. In the months before the offenses,
Holiday continually harassed and threatened Wilkerson. He threatened to kill her and "make
her pay." He told others that he was going to burn down her house. His actions show a
planned and calculated effort. He purchased a gun and practiced shooting on the day of the
offenses. He arranged to be driven out and dropped off at Mitchell's house in the country. 
He dressed in black clothing and armed himself with a can of gasoline, cigarette lighters, a
gun, and ammunition. He demonstrated his disregard for the lives of the children when he
poured gasoline on and around the car they were sitting in and attempted to light it. When
that did not work, he ordered everyone into the house with instructions to remain there while
he went to get more gasoline. He terrorized Mitchell, Keller, and the children by ordering
them around at gunpoint. If he had not wanted to endanger the children, he would not have
allowed them to remain in the house while he directed the soaking of various items of
furniture and the pouring of gasoline throughout the house. Rather than demonstrate shock,
remorse, or anguish at the fact that the children were unreachable inside the burning house,
Holiday attempted to apprehend Mitchell, and then fled the scene, ramming a police car, and
leading police on a manic high-speed chase. A rational jury could conclude that Holiday
knowingly or intentionally caused the death of the three victims by burning them in a fire.

 The evidence is factually sufficient as well. In a factual sufficiency review, all of the
evidence is viewed in a neutral light, and the verdict will be set aside only if the evidence is
so weak that the verdict is clearly wrong and unjust, or if the contrary evidence is so strong
that the "beyond a reasonable doubt standard" could not have been met. (5)

 Holiday points out that he did not tell Mitchell to pour gasoline on or around the
couch where the children were seated and that Mitchell did not actually see Holiday lighting
the fire. He also points to defense expert testimony which contradicted the State's expert
testimony regarding potential ignition sources and the amount of time the gasoline vapors
would need to circulate before igniting with an accidental source. The defense expert stated
that were other possible ignition sources such as household appliances, and that the pilot light
on the heater was "the number one candidate" as the source of ignition. The State's expert
excluded the heater as an ignition source based upon testimony that the pilot light was turned
off. The contrary evidence is not so strong that the jury could not have found intent or
knowledge beyond a reasonable doubt. The evidence in support of the verdicts is not so
weak as to render the verdicts "clearly wrong and unjust." (6) Points of error one and two are
overruled.

Sufficiency of the Evidence - Future-Dangerousness

 In point of error thirty-seven, Holiday claims that the evidence is legally insufficient
to support the jury's affirmative finding of future-dangerousness because his crimes were not
calculated or deliberate, he was suffering from depression and reacting to stressful and
traumatic circumstances, he showed remorse, and he had no prior convictions. 

 Reviewing the legal sufficiency of this special issue, we view the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have
found beyond a reasonable doubt that there is a probability that appellant would commit
criminal acts of violence constituting a continuing threat to society. (7) 

 At punishment, the State presented evidence that Holiday told a fellow inmate that he
had sexually assaulted Tierra on two occasions. He told the inmate that on the second
occasion he went on to penetration because "she seemed like she liked it." Holiday's aunt,
who was several years younger than Holiday, testified that Holiday raped her when she was
sixteen and had been babysitting Holiday's and Wilkerson's children. She did not report the
offense. Holiday's niece testified that she had been raped by Holiday. She went to the
hospital afterwards for treatment and she reported the offense, but it was not prosecuted. 

 Holiday presented evidence of his impoverished childhood and his mother's and
stepfather's lack of interest and involvement in his life. Holiday left home when he was
fifteen. The Madison County sheriff testified that they had no problems with Holiday during
the time he was awaiting his trial in the Madison County Jail. The sheriff's employee
responsible for Holiday's trial security testified that he had not had any problems with
Holiday. Psychiatrist Fred Fason testified that he interviewed Holiday and reviewed various
documents, including a diagnostic profile prepared by a psychologist. Fason concluded that
Holiday suffered from psychotic depression and also had a history of alcoholism or substance
abuse. 

 In rebuttal for the State, psychiatrist Edward Gripon agreed that Holiday suffered from
depression and had a history of alcohol abuse. Gripon also testified that Holiday clearly fit
the diagnosis for antisocial personality disorder. According to Gripon, this personality
disorder would persist with little or no change throughout Holiday's adult life. Gripon
testified that "given the history of antisocial personality disorder and the clear history of
escalation of violent behavior, culminating in committing capital murder," it was "more
likely than not" that Holiday would commit criminal acts of violence in the future. Gripon
stated that Holiday's eighteen months of good behavior in jail should be viewed in the
context of the pending trial and Holiday's incentive to avoid engaging in behavior that would
provide the State with evidence that could be used against him.

 Viewing the evidence in the light most favorable to the verdict, the record supports
the jury's finding that Holiday would be a future danger. Acting out of anger and revenge,
Holiday planned his actions and carried them through. He terrorized Mitchell, Keller, and
the children at gunpoint. He was undeterred by his initial unsuccessful attempt to kill Tierra
and Jasmine and found a way to see his plan through by forcing Mitchell to retrieve more
gasoline. In addition to the evidence that Holiday sexually assaulted Tierra on more than one
occasion, the State also presented evidence of Holiday's sexual assault of his aunt and of his
niece. Dr. Gripon testified that Holiday clearly fit the diagnosis for antisocial personality
disorder, and that this disorder would persist throughout his life. Gripon also testified that
in his opinion, Holiday would more likely than not commit criminal acts of violence in the
future. The evidence viewed in the proper light, supports the jury's affirmative answer to the
future-dangerousness issue. Point of error thirty-seven is overruled. 

Exclusion of Venireperson Sessions

 In his third point of error, Holiday claims that the trial court erred in granting the
State's challenge for cause to venireperson Servaine Sessions, in violation of Wainwright 
v. Witt. (8) Holiday contends that Sessions was qualified to serve and that the State did not
establish that her views regarding the death penalty would substantially impair her ability to
follow the law.

 This is a factually unique case. Sessions was questioned by the parties and the law
pertaining to the punishment phase and the special issues had been fully explained to her. 
The parties concede that nothing in Sessions's initial voir dire would subject to her a
challenge for cause. Sessions's voir dire examination by the parties took place on May 8,
2002. The parties exercised their strikes and the jury panel, which included Sessions, was
selected on May 15, 2002. On May 21, 2002, before the panel was sworn, Sessions
approached the court with her concerns. To address her concerns, the court held a hearing
where the following exchange occurred:

 [THE COURT] I don't know anything wrong with [sic] at this point with you. 
I may not be able to actually make any final decisions on what you're about to
say. Chances are, given the circumstances, we are this far along in the trial,
you will be required to continue in your service. But I just want the lawyers
to know what is in your heart and in your mind because they are entitled to
know that. So you may go ahead and just tell us what it is that you think may
be a problem for you.


 [SESSIONS] I thought for sure when I was here that I could - after listening
to the trial and receiving all the information I could decide one way or the
other on - after the guilty phase if I had to do the death penalty phase. And I
been praying about it. And that's just the only thing, I don't know. I'm not
saying I can't serve and do my civil duty, I'm just not sure even after hearing
the information if I could say one way or the other yes.


 Q What do you mean yes?


 A On the death penalty. That was the thing. I thought if he was found guilty
and then I didn't know I was going to have to do the sentencing phase or if the
Judge was going to do that. And, if so, after listening to those two questions,
if it's going to be considered the death penalty, that's what I was afraid of. I
don't know one way or the other. I thought yes, I could say if it was put to me
yes, this person deserves the death penalty, and now I'm not - just not certain
on that.


 Q You were certain at the time but since then you have become less certain? 
Is that what you're telling us?


 A Yes. I'm not totally not certain or totally certain. It's just that I have had
some confusing thoughts on it. . . . I have been praying about it and seem like
everything I read - it wasn't anything dealing with the court, it's just that I
read my Bible daily and seem like every page I went to it has something to do
with humanitary (sic), it has something to do with Commandments. And I
didn't know if that was God, God's way of speaking to me on what - on what
I was about to do or what. And I just wanted to be honest and up front and let
them know, I don't know one way or the other. If you can understand that? 
And this just didn't happen when she told me - when the County Clerk called
me I was like oh, God. So I prayed that night. For two nights I didn't sleep.


 The parties were later given the opportunity to question Sessions further, but both
declined. The State challenged Sessions for cause and, over Holiday's objection, the court
granted the challenge, stating:

 - her religious views opposing the death penalty, in my judgment, based on my
personal observations of her while on the stand, of her demeanor, that her
religious views opposing the death penalty are of such a nature that they
would, in my opinion, prevent or impair her performance of her duties as a
juror and in accordance with the jury's instructions and her oath.


Holiday claims that the trial court's decision to grant the State's challenge for cause violated
Wainwright. 

 Under Wainwright, a prospective juror may be struck for cause when the juror's 
views regarding the death penalty "would prevent or substantially impair the performance
of his duties as a juror in accordance with his instructions and oath." (9) A juror's bias need not
be proven with "unmistakable clarity." (10) In reviewing a grant or denial of a challenge for
cause we give great deference to the trial court because it is in the best position to evaluate
the prospective juror's demeanor and response, as well as the context and tone of the
questioning. (11) Particular deference is given when the prospective juror's answers are
vacillating, unclear, or contradictory. (12) 

 Given the facts of this case, we cannot say the trial court abused its discretion in
finding that Sessions's personal beliefs regarding the death penalty rendered her impaired or
unable to follow the law as instructed. Even though the nature of the sentencing phase and
the jury's role in answering the special issues had been fully explained to Sessions, she was
distressed enough to approach the trial court after she was selected and just days before
evidence was to be presented. The judge began his query of Sessions's potential problem
by reminding her that she was one of twelve selected out of about ninety venirepersons
interviewed. He stated that, given the late stage of the proceedings, she would most likely
be required to serve. Following these reminders, Sessions expressed her dilemma, stating
that she was "not sure" and repeatedly contending that she could not say "one way or the
other" whether she would be able to answer the special issues. While the trial court did not
press Sessions, she conveyed that she did not know how she would react when seated or how
she would consider the special issues in the sentencing phase involving a potential death
sentence. Sessions also stressed how she agonized over the matter after receiving word of
her selection, stating that she had prayed, had read her Bible, and had not slept for two nights.

 Although the trial court did not utilize the key language from Wainwright when
questioning Sessions, the record supports the trial court's conclusion that she would be
impaired as a juror. As this Court has recognized before, when a potential juror "is
persistently uncertain about his ability to follow the law, we will not second guess the trial
court." (13) Point of error three is overruled.

Admission of Hearsay Statements Made by Tierra

 In his fourth point of error, Holiday claims that the trial court erred in admitting the
testimony of Jane Riley regarding hearsay statements made by Tierra.

 Wilkerson testified that on March 5, 2000, Tierra stayed home from school with
Holiday because she was sick. Wilkerson went to work. When Wilkerson got home that
night, she discovered a pair of Tierra's panties that were full of blood. Wilkerson also
noticed that the comforter and sheets from her bed had been washed, although Holiday
denied washing them. The next morning Wilkerson took Tierra to be examined by Dr. Ali
Al-Himyary. After the doctor's examination, and based upon his conclusions, Wilkerson
went to the police station to file charges against Holiday. A case worker from Child
Protective Services ("CPS") was called to interview Tierra. Jasmine arrived later and was
also interviewed by the CPS worker. After the interviews, two police officers drove
Wilkerson to her house. The officers brought Holiday outside while Wilkerson went in to
look for the bloody panties. Wilkerson was unable to find the panties, but testified that
Holiday later admitted to her that he had burned them. Wilkerson and her children stayed at
Mitchell's that night and Holiday moved out the next day.

 Dr. Al-Himyary testified that Wilkerson brought Tierra in to see him in early March
of 2000. Wilkerson told Al-Himyary that she had discovered bloody underwear belonging
to Tierra and was concerned that Tierra had been sexually assaulted by Holiday. Al-Himyary
testified that his office was not equipped with a "rape kit" like those used by emergency
rooms in such circumstances, but he conducted a physical exam of Tierra. He observed
"lacerations and bleeding" on both sides of the labia majora and bruises on Tierra's thighs. 
Al-Himyary informed Wilkerson that it was his conclusion that Tierra had been sexually
abused. As required by law, Al-Himyary contacted CPS.

 Jane Riley, a pediatric nurse practitioner, testified that she had specialized training and
experience in the areas of sexual and physical abuse. Riley testified that she works with two
pediatricians, accepts her own patients, and also takes referrals from CPS and other law
enforcement agencies. Riley examined Tierra pursuant to a referral from the police
department or CPS. She explained the purpose of her examination of Tierra:

 [Tierra] was referred to me for further diagnosis and treatment. . . . My
purpose was to determine the extent of her injury, if there was one. I wasn't
sure at that point. And to assess how it happened and to provide treatment for
her.


Riley testified that Tierra was "bleeding quite a bit," so Riley put cold compresses on the
injuries and called in a gynecological associate to help her decide whether stitches were
necessary. Although they initially decided that some stitches were called for, they ultimately
decided against them because Tierra was so upset and the bleeding had stopped. Instead,
they decided to instruct Wilkerson on how to treat for infection and what to do if the bleeding
started again. Riley saw Tierra for a follow-up exam ten days later and the injuries were
healing well. The following portion of Riley's testimony is the subject of this point of error:

 [PROSECUTOR] Now, what you can remember or what you can recall from
reviewing your notes, please use - please tell the jury what you said to the
child and what the child said to you as you were doing this medical history. .
. .


 [RILEY] I asked her if she knew why she was there with me and she said no.
And then I asked her if she knew why there was blood in her panties and she
said no. And then I asked her if something had happened to her and she said
yes. And then I asked her if anyone was with her when something happened
and she stated my step daddy. I then asked her - I told her it was important for
her to tell me what happened to her so that I could make sure she was okay. 
At that point she put her head down and she didn't say anything else. And
then I asked her if someone had told her not to tell and she said yes, my step
daddy. And then I asked her what he had said and she said that he said if I told
anybody he would get in a lot of trouble.


Holiday objected to this testimony on various grounds, including the violation of his rights
under the Confrontation Clause. Holiday argues on appeal that Tierra's out-of-court
statements were testimonial and inadmissible under Crawford v. Washington. (14)

 We need not decide whether Tierra's statements made to Riley were testimonial
within the meaning of Crawford because we are able to conclude beyond a reasonable doubt
that any error in admitting the statements did not contribute to Holiday's convictions or
punishment. (15)

 The statements did not inject any new facts or embellish the facts to any extent beyond
that testified to by other witnesses. Wilkerson testified that she suspected Holiday when she
discovered the bloody panties. Al-Himyary testified that Wilkerson informed him that she
suspected Holiday of abusing Tierra. Wilkerson testified that she filed charges against
Holiday, that she received a protective order against him, that he was evicted from her home,
and that he was indicted for sexually assaulting Tierra. There was testimony from several
witnesses referring to the pending charges. Tierra's statements to nurse Riley identifying
Holiday as the responsible person for her sexual assault were neither direct nor elaborate and
did not provide any new or more prejudicial information than was admitted on the issue from
other sources. Point of error four is overruled.

Motion to Quash

 In point of error five, Holiday claims that the trial court erred by denying his motion
to quash the indictments. There are three indictments, one for each victim. Each indictment
alleges in part that Holiday "intentionally or knowingly cause[d] the death of [the named
victim] by burning said individual with fire." Holiday moved to quash the indictments on
the ground that this allegation did not provide adequate notice of the manner and means so
that Holiday could prepare his defense. The trial court denied the motion. Holiday also
suggests that there was party liability presented by Mitchell's actions in pouring the gasoline
throughout the house, and that this Court should overrule case law to the contrary and require
party liability to be pled in the indictment. Because there was no parties issue presented in
the case and because Holiday did not make the parties argument to the trial court, we decline
to address this aspect of Holiday's claim. (16)

 The adequacy of an indictment is a question of law. (17) When such a question does not
depend upon an evaluation of witness credibility or demeanor, and the trial court is in no
better position to make the determination, then the reviewing court will address the issue de
novo. (18)

 The charging instrument must be specific enough to inform a defendant of the nature
of the accusations against him so that he can prepare a defense. (19) The indictments in this
case specifically allege that Holiday intentionally or knowingly caused the victims' deaths
"by burning with fire." By alleging how the victims died -- by being burned in a fire -- and
alleging that Holiday acted intentionally or knowingly in causing such deaths, the State
provided enough information to allow Holiday to conduct the necessary investigation to
prepare his defense. (20) The trial court did not err in overruling the motion to quash on these
grounds. Point of error five is overruled.

Instruction on the Failure to Agree on Answers to the Special Issues 


 In his sixth point of error, Holiday claims that the trial court erred when it prohibited
him from informing jurors during general voir dire that the law does not require a "yes" or
"no" answer on the special issues, but is satisfied if jurors are unable to reach a verdict. 
There is no constitutional violation in preventing the jury from being informed of the effect
of their failure to agree on their answers to the special issues. (21) Point of error six is
overruled.

Challenge for Cause to Venirepersons O'Dwyer and Dishman

 In point of error seven, Holiday contends that the trial court abused its discretion when
it denied his challenge for cause to venireperson Michael O'Dwyer on the ground that he had
a bias or prejudice against the law in favor of an affirmative answer to the future-dangerousness issue. Holiday argues that O'Dwyer's understanding of the term "probability"
meant that he would automatically answer the first special issue in the affirmative. In his
ninth point of error, Holiday claims that the trial court abused its discretion when it denied
his challenge for cause to venireperson Todd Dishman because he could not distinguish
between "probability" and "possibility."

 Although the term "probability" need not be defined, in Hughes v. State, (22) we
emphasized that it means something more than a mere possibility. A venireperson who
persistently understands the term "probability" as only a percent possibility, rather than a
likelihood or good chance is properly challengeable for cause. (23) The law must be explained
to the venireperson, and he must be told that he is required to see and accept the distinction
between the terms "probability" and "possibility." (24) Once the law is explained, if the 
venireperson continues to insist upon an understanding of the term that is inconsistent with
Hughes, then he is properly challengeable for cause.

 There was confusion and inconsistency in O'Dwyer's articulation of his understanding
of the term probability. When questioned by the prosecutor, O'Dwyer agreed that probability
means more than a possibility, that it is distinguishable from possibility and certainty, and
that it falls somewhere between those two terms. When questioned by defense counsel,
O'Dwyer stated that a high chance might justify a "yes" answer on the first special issue, but
a low chance would not necessarily justify a "no" answer. And he stated that probability
means "any chance." Nonetheless, O'Dwyer agreed with defense counsel's statement that
"anything is possible, not everything is probable."

 Holiday argues that O'Dwyer was challengeable because he would "automatically"
answer the first special issue in the affirmative. The prosecutor specifically questioned
O'Dwyer on whether he would "automatically" answer the first issue in the affirmative. 
O'Dwyer agreed that he could envision circumstances where the facts of the offense alone
would call for an affirmative answer, and he could also envision circumstances that would
not. He stated, "Depends on the circumstances." Although some of O'Dwyer's responses
indicate a misunderstanding of the term probability, others reflect that he correctly
understood the term as distinguishable from and meaning something more than, a mere
possibility. Given his inconsistency, we cannot say the trial court, viewing the voir dire as
a whole, abused its discretion in denying Holiday's challenge for cause.

 In support of his complaint regarding venireperson Dishman, Holiday points to a
portion of Dishman's voir dire in which he stated that "probability" means "possibility" and
"a chance." However, this statement appears to be isolated and defense counsel did not
clarify the distinction between the terms and elicit responses from Dishman that reflected a
continued insistence upon an understanding of the terms that is inconsistent with Hughes. (25) 
Viewing his testimony as a whole, we cannot say the trial court abused its discretion in
overruling Holiday's challenge for cause to Dishman on these grounds. Points of error seven
and nine are overruled.

Challenges for Cause to Venireperson Masters

 In his eighth point of error, Holiday claims that the trial court abused its discretion
when it denied Holiday's challenge for cause to venireperson Linda Masters on the ground
that she had a bias or prejudice in favor of an affirmative answer on the first special issue. 
Holiday relies on Masters's statement that if the accused had killed three children already,
that would be enough to justify a "yes" answer to the first special issue. 

 Masters stated toward the beginning of her voir dire that "if that person had already
killed three children that should be enough" for an affirmative finding of the future-
dangerousness issue. But she also gave other responses indicating that she would listen to
all of the evidence presented before rendering a decision. She agreed that she "would answer
the first special issue honestly based on the evidence" as opposed to answering it based on
the age of the victims, and that she "would wait and hear the evidence and make a decision
based on that evidence" with respect to both of the special issues.

 Moreover, Masters was not challengeable for cause on the ground that she would
make an affirmative finding of future-dangerousness if the accused had been found guilty of
murdering three children. Venirepersons are not challengeable for cause based upon the type
and amount of evidence they would require to conclude that there has been a showing,
beyond a reasonable doubt, of future-dangerousness. (26) Only a refusal to answer the issue
"yes" unless a particular type of evidence is presented, even if the other evidence presented
were sufficient to convince them of the special issue beyond a reasonable doubt, would
render the venireperson challengeable for cause. (27) Accordingly, the trial court did not err in
denying Holiday's challenge to Masters based upon her view that a person who had been
found guilty of murdering three children would be a future danger. Point of error eight is
overruled.

 In point of error eleven, Holiday claims that the trial court abused its discretion when
it denied his challenge for cause to Masters because she would not consider age in answering
the special issues. Holiday did not assert this as a ground for his challenge to Masters at trial. 
This issue is not preserved for review. (28) Point of error eleven is overruled.

 In Holiday's thirteenth point of error, he claims that the trial court abused its
discretion when it overruled his challenge for cause to Masters, who stated that the decision
of death "will not totally rest in my lap" because the defendant "would have appeals." The
complained-of statement occurred in the following context:

 [DEFENSE COUNSEL] Let me tell you - I want to make sure I understand
where you are on this. I'm [sic] got a second set of children; six-year-old,
another year old. Now, before they were born if I would look at a capital
murder case, a history of child abuse to me for someone who was charged with
capital murder didn't affect me as much as it does now. But now for some
reason I think if I was on a jury and in a capital murder case even, if I found
somebody guilty, guilty of capital murder, and if I found they were a threat to
society, if I heard evidence of a lot of child abuse when they were growing up
I don't believe I could kill that person. I just don't believe I could.

 

 [MASTERS] When you say you don't believe you could kill that person, you
mean you don't believe you could give them the death penalty?


 Q I don't believe I could get give [sic] the death penalty. I don't believe I
could do it anymore.


 A I would like to make a statement.


 Q Okay.


 A I do not like to be - I don't like that you have said to me if I am on the jury
and I decide for the death penalty that I, in fact, am killing that person.


 Q Okay.


 A That is offensive to me. Because, in fact, I know that that person would
have appeals and that will not totally rest in my lap. And I will be one of
several people, not an individual committing an act of murder against that
person.


 Q I realize that. But you understand, though, that in the appeal process that the
case may not get reversed?


 A That's right.


 Q So the responsibility that you have could be the end result. You understand
that?


 A I do.


 When Holiday challenged Masters for cause in part on the ground that she considered
her role as a juror to be of diminished responsibility in light of the other jurors and the appeal
process, the trial court stated,

 If anything, she may have overreacted to [defense counsel's] suggestion that
she would be killing this person. She was offended by that. I don't think
[defense counsel] meant to offend her, but I think his choice of words achieved
that result.


 In view of Masters's voir dire as a whole and the context of her statement, the trial
court did not abuse its discretion in overruling Holiday's challenge on this ground. Point of
error thirteen is overruled.

Challenge for Cause to Venireperson Frisina

 In point of error ten, Holiday claims that the trial court abused its discretion when it
denied his challenge for cause to venireperson Joyce Frisina because she could not
distinguish between "probability" and "possibility." Holiday relies on an isolated exchange
between Frisina and defense counsel in which Frisina stated that probability meant "a
possibility" or "a chance." However, defense counsel did not clarify the distinction between
the terms and elicit responses from Frisina that reflected a continued insistence to an
understanding of the terms that is contrary to Hughes. (29) Although the prosecutor explained
to her that probability "doesn't mean certainty" or "a mere possibility," that explanation was
part of a longer monologue about future-dangerousness, was followed by a lengthy objection,
discussion, and ruling, questions and answers regarding the mitigation issue, and a short
recess. It is possible that Frisina did not remember, much less understand and apply, the
prosecutor's brief explanation buried within the much earlier monologue. Absent a showing
that the law was explained to Frisina and that she understood the law, but demonstrated a
refusal to follow it, the trial court did not abuse its discretion in overruling Holiday's
challenge for cause. Point of error ten is overruled.

Challenge for Cause to Venireperson Haynes

 In point of error fourteen, Holiday claims that the trial court abused its discretion
when it denied his challenge for cause to venireperson Richard Haynes. Holiday complains
of Haynes's statement that once he answered special issue number one "yes," then there was
only "a possibility" he would answer the mitigation issue "yes." Holiday also says Haynes
was challengeable because Haynes would place a burden on the defendant to prove that an
affirmative answer was warranted on the mitigation issue, but that contention was not raised
at trial and is therefore not preserved for review.

 Haynes was questioned at length by both parties about whether an affirmative finding
on future-dangerousness would make an affirmative finding on the mitigation issue difficult. 
Haynes repeatedly stated that "if warranted" he would make an affirmative finding on
mitigation despite an affirmative finding on future danger. When questioned by defense
counsel on the issue, defense counsel suggested to Haynes that an affirmative answer on
future danger might cause him to be biased toward death, and Haynes agreed. Haynes stated
that he probably would have a bias toward death, but that "you still have to look and see if
there is something there that might could change that no [on the mitigation issue]." He
disagreed with defense counsel that there was a "probability" that he would answer the
mitigation issue "yes" but stated that there was a "possibility" that he would, depending on
the evidence. Haynes testified that even upon an affirmative finding on future danger, he
would consider all the evidence presented in mitigation in answering that issue. Given the
whole of Haynes's voir dire, we cannot say the trial court abused its discretion in overruling
Holiday's challenge for cause. Point of error fourteen is overruled.

Challenge for Cause to Venireperson Penny

 In point of error twelve, Holiday claims that the trial court abused its discretion when
it denied his challenge for cause to venireperson Kenneth Penny because he would not
consider age or state of mind in answering the special issues. Holiday did not assert Penny's
failure to consider age as a ground for his challenge to Penny at trial; therefore, this issue is
not preserved for review. The complained-of exchange regarding state of mind was brief and
undeveloped, and the law was not explained to Penny with respect to consideration of such
facts. Accordingly, we cannot say the trial court abused its discretion in overruling Holiday's
challenge for cause on this ground. Point of error twelve is overruled.

Motion for a Mistrial Based on the State's use of Sixteen Peremptory Challenges


 In point of error fifteen, Holiday claims that the trial court erred in denying his motion
for a mistrial on the ground that the State used sixteen peremptory challenges. In point of
error sixteen, Holiday claims that the trial court erred in allowing the State to use a sixteenth
peremptory challenge to strike venireperson Donnie Thomas. 

 The State utilized fifteen strikes in selecting the original panel and Holiday utilized
sixteen strikes. The parties were then each allowed to exercise a strike from the list of
venirepersons who were qualified to serve as alternates; the State struck venireperson
Thomas from the alternate list and Holiday struck another venireperson. The court
announced that venirepersons Adams and Pryor would be the alternates. Holiday identified
venireperson Stone as an objectionable juror on the panel of twelve and also identified
alternate juror Adams as objectionable. He requested and was denied an additional a
peremptory to use on the alternates. Holiday then objected to the State's use of a peremptory
challenge against Thomas on Batson grounds. That objection was overruled.

 Several days after the panel and the alternates were selected, but before they were
sworn, juror Servaine Sessions (one of the panel of twelve) indicated she had a problem with
serving, as discussed above in point of error three. The State's motion to excuse Sessions
for cause was granted. The court announced that it would move the first alternate, Adams,
into Sessions' position on the panel. Holiday objected to placing Adams on the panel on the
ground that Adams was not in the original strike zone and was an objectionable juror. The
court then granted Holiday an additional peremptory strike to use on any of the jurors now
within the strike zone -- that is, those that were now on the panel of twelve, including
Adams. Holiday elected to use the strike against juror Stone. He requested and was denied
an additional strike and he identified Adams as objectionable. Stone was struck and
alternates Adams and Pryor were seated as jurors on the panel. There were no alternates. 

 Holiday immediately moved for a mistrial on the grounds that it was unfair and risky
to proceed to trial without alternates. The motion was denied. Five days later, Holiday filed
a written motion for mistrial on the grounds he now asserts on appeal. The trial court denied
the motion.

 In arguing that the State was improperly allowed sixteen peremptory challenges,
Holiday relies upon Article 35.15, which allows the State only fifteen peremptory challenges,
and upon Goode v. State, (30) in which Holiday contends the defendant was entitled to a mistrial
because the parties were allowed an improper number of peremptory strikes. The trial court
did not abuse its discretion under Article 35.15, and Goode does not control here.

 Article 35.15 provides that both parties in a capital case are entitled to fifteen
peremptory strikes. There is no provision stating that the trial court may not, in its discretion,
grant the parties more than the fifteen to which they are entitled. In Goode, the defendant
was entitled to a mistrial because she was unfairly limited to nine peremptory challenges
following the severance of a jointly tried co-defendant. Although it was noted that the State
was allowed sixteen peremptory challenges in Goode, the Court's holding was based upon
the limitation of the defendant's challenges to nine when she was entitled to fifteen. (31) 
Holiday's claims are without merit. Points of error fifteen and sixteen are overruled.

Prosecutor's Comment on the Credibility of State's Witness Mitchell

 In his seventeenth point of error, Holiday claims that the trial court erred when it
denied Holiday's request for an instruction to disregard the prosecutor's improper comment
about the credibility of State's witness Beverly Mitchell. Holiday complains about the
following emphasized portion of the prosecutor's opening statement at the guilt phase of
trial:

 Now we understand that Ms. Beverly Mitchell was probably our most
important witness. She is the only witness that we have who was in the house
with Raphael Holiday and the children when the fire started. What she has to
say is very important. We believe that when she testifies that you will see a
lady who is honest and forthcoming.

(emphasis added). Holiday's objection to the statement was sustained; however, the trial
court denied Holiday's request for an instruction to disregard. The prosecutor continued,
without objection:

 We believe that once you have heard her testimony that you will have a good
picture of what happened out there that night.


 It is improper for a prosecutor to inject personal opinion in statements made to the
jury. (32) It is especially egregious for a prosecutor to inject his personal opinion about the
credibility of a key witness. (33) Even so, such a statement will not result in "reversible error"
unless it is determined that the statement was harmful. (34) We disregard nonconstitutional
errors that do not affect an appellant's substantial rights. (35) A substantial right is affected
when the error has a substantial and injurious effect or influence in determining the jury's
verdict. (36) A reviewing court will not reverse a conviction for nonconstitutional error if it has
"fair assurance that the error did not influence the jury, or had but a slight effect." (37)

 To the extent the prosecutor's statement conveyed his opinion about the credibility of
the State's key witness, it was inappropriate and the trial court properly sustained Holiday's
objection. While an instruction to disregard would have been helpful and would have
eliminated any possibility of confusion or question in the minds of jurors, the court's failure
to give the instruction was not reversible error. The complained-of statement was couched
in terms of how the prosecutor expected the jury to view the witness, rather than a direct
comment on what the prosecutor himself thought about the witness. And the prosecutor's
follow-up statement, that he believed that once the jury had "heard her testimony that you
will have a good picture of what happened out there that night" softened any improper
credibility bolstering suggested by the first statement and made clear that the prosecutor was
simply stating how he expected the jury to view the evidence presented through that witness. 
We have a fair assurance that the prosecutor's statement (and the court's failure to instruct
the jury to disregard it) did not influence the jury, or had but a slight effect. Point of error
seventeen is overruled. 

Admission of Expert Testimony - Dr. DeHaan

 In his eighteenth and nineteenth points of error, Holiday contends that there was not
a sufficiently reliable scientific basis for certain testimony by the State's expert, Dr. John
DeHaan. He complains that DeHaan's testimony that the fire was not ignited by an electrical
or gas source was unreliable, and that his testimony that Holiday's injuries were consistent
with the hypothesis that Holiday ignited the fire also had an unreliable scientific basis.

 Rule of Evidence 702 provides:

 If scientific, technical, or other specialized knowledge will assist the trier of
fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education
may testify thereto in the form of an opinion or otherwise.


 To aid the jury, scientific evidence must be sufficiently reliable and relevant. (38) The
proponent of the proffered evidence bears the burden of demonstrating through clear and
convincing evidence that the evidence is reliable. This burden is met by showing that (1) the
underlying scientific theory is valid; (2) the technique applying the theory is valid; and (3)
the technique was properly applied on the occasion in question. (39) A number of factors may
be helpful to the trial court in assessing reliability, including the following non-exclusive list:

 (1) the extent to which the underlying scientific theory and technique are
accepted as valid by the relevant scientific community, if such community can
be ascertained, (2) the existence of literature supporting or rejecting the
underlying scientific theory and technique, (3) the clarity with which the
underlying scientific theory and technique can be explained to the court, (4)
the potential rate of error of the technique, (5) the availability of other experts
to test and evaluate the technique, (6) the qualifications of the expert(s)
testifying, and (7) the experience and skill of the person(s) who applied the
technique on the occasion in question. (40)


We review a trial court's decision to admit or exclude scientific expert testimony under an
abuse of discretion standard. (41)

 The trial court held a hearing outside the presence of the jury to determine the
admissibility of DeHaan's testimony. DeHaan, a forensic scientist, had worked as a
criminologist for thirty-three years; for the past twenty years his focus had been on fire and
explosion investigations or laboratory analysis. He testified that fire is a chemical process
governed by certain fixed rules of chemistry and physics. He testified that the basic
principles governing fire behavior are generally absolute, but the conditions surrounding a
particular fire are variable. He stated that predictions and conclusions can be made about a
particular fire based upon the basic governing principles and how other fires within similar
conditions have responded. 

 DeHaan further testified that, in his research involving fires and explosions, a large
percentage of his time had been spent setting fires in various settings and under different
conditions and reconstructing fires in order to test and evaluate the principles under varying
conditions. DeHaan testified that in twenty-five years of conducting such research and
analysis, he had orchestrated and set about five hundred structure fires, one hundred and
twenty vehicle fires, and about two hundred small-scale tests involving furniture and fuels. 
He explained that the process of gathering information and assessing evidence during a fire
investigation begins with observations from witnesses. He also testified that it includes: (1)
gathering information from the scene, such as the amount of damage, the time frames of
detection, suppression, and extinguishment; (2) testing various possibilities as to manner and
location of ignition; (3) assessing the way the fire spread and its time frames; (4) studying
the physical evidence; and (5) testing and retesting the possibilities to establish the reliability
of the various indicators to arrive at a conclusion about the ignition. DeHaan testified that
this method of gathering information, reviewing the physical evidence, and testing
possibilities is used in a "very high percentage" of fire investigations and is a valid process
that has been verified through numerous tests, training exercises, and demonstration fires. 
DeHaan testified that he properly applied these established and verified techniques in making
his determination in the instant case. 

 Holiday objected to the admissibility of DeHaan's opinion testimony as not based
upon a valid scientific theory, as having an insufficient factual basis, and as largely
speculative.

 We find that the State met its burden in showing that DeHaan's testimony was
reliable. DeHaan's testimony addressed nearly all of the seven considerations for the trial
court, demonstrating that the technique is well-accepted as valid, explaining the theory and
technique with clarity and focus, showing evidence of his experience and training, and
explaining how he applied those to his investigation of the instant case. Holiday complains
that certain aspects of DeHaan's testimony lacked a scientific basis, such as his reasons for
ruling out some of the ignition sources and his testimony that Holiday's injuries "were
consistent with" the State's theory that he ignited the fire. As DeHaan explained, while
certain scientific principles relating to fires are absolute, the surrounding conditions may
vary. Common sense dictates that some speculation is involved in attempting to reconstruct
a scene that was destroyed by fire, or in assessing a burn injury based upon numerous
variables. That a factfinder will have to assess how much those matters bear upon evaluating
DeHaan's overall conclusions in light of the expertise he brings to the issues goes to the
weight of DeHaan's testimony and not its admissibility. (42) The trial court did not abuse its
discretion in concluding that DeHaan's testimony had a reliable scientific basis. Points of
error eighteen and nineteen are overruled.

Admission of Expert Testimony - Reiter

 In point of error twenty, Holiday contends that the trial court erred in allowing David
Reiter to testify that the probability that the fire was ignited by an electrical spark in the air
conditioner or refrigerator was extremely low. The legal principles discussed in the
preceding point of error apply here.

 The trial court held a Kelly/Daubert hearing to address the admissibility of Reiter's
testimony. Reiter, a forensic electrical engineer, testified that he began working in the
electrical engineering field in the late 1960's, and specifically in forensic electrical
engineering and fire investigation for the past twenty years. Reiter testified that during the
past twenty years, he had investigated or been involved in the investigation of two thousand
or more fires. He had testified as an expert in the field thirty-five to forty times. Reiter had
examined hundreds of relay switches on refrigerators and air conditioning units over the
years. 

 Reiter examined the refrigerator and the air conditioning unit at the scene in the
instant case and concluded that, given all the circumstances surrounding the fire, the
probability that either of those appliances were ignition sources is extremely low. On cross-examination, Reiter testified that his conclusion was based in part upon several assumptions
about certain facts as relayed to him by the district attorney's office (and verified at trial by
witness testimony), specifically that between three and a half and five gallons of gasoline
were poured throughout the premises in the span of one and a half to two minutes, and that
the air conditioner was turned on and operating. Reiter also explained that his conclusion
was based upon an understanding about the nature of gas and gas vapor and upon theorizing
about the gas and gas vapor distribution and concentrations throughout the room. Holiday
objected that Reiter's testimony was not admissible because it was too speculative to be
considered based upon sound scientific theory.

 The matters complained about by Holiday go to the weight of Reiter's testimony and
not its admissibility. (43) Reiter was clearly qualified and explained his conclusion about the
probability of ignition sources in scientific terms, based upon known principles regarding the
movement, distribution, and concentration of gas vapors. That Reiter's conclusions were
based upon certain assumptions and speculation about how the gas molecules were
distributed throughout the space was appropriate material for cross-examination. The trial
court did not abuse its discretion in concluding that Reiter's testimony had a reliable
scientific basis. Point of error twenty is overruled.

Admission of Expert Testimony - Dr. McLain

 In point of error twenty-two, Holiday claims that the trial court erred when it allowed
Dr. Janie McLain to testify that Holiday's burns were consistent with someone reaching
down with the right arm near where an accelerant had been poured. Holiday contends that
McLain's testimony was not scientifically reliable because it was largely speculative, and
even if reliable, the testimony was dangerously misleading.

 McLain testified that she conducted at least an autopsy a day as a medical examiner
in the Dallas County office. Many of the autopsies involved burn victims. In a hearing
outside the presence of the jury, the State declined to ask McLain any questions about the
basis for her opinion regarding Holiday's injuries. Responding to questions from Holiday,
McLain testified that, from the photographs of Holiday's burns, it appeared to her that the
burns all occurred at the same time as they were all consistent in their appearance. She
agreed that her conclusion about the burns was based upon her understanding of human
nature, her understanding of how fire travels, and she added, her "educational background." 
She stated that she had expertise in "what fires do to people and what I see on the bodies." 
She testified that she did not know what "heat release rate" meant, but that she could say that
a smaller body will char or burn more rapidly than a larger one. Holiday objected to McLain
testifying that Holiday's burns were consistent with his leaning down and starting the fire. 
He argued, among other things, that there was no rational scientific basis for her testimony
and that it was speculative. The court overruled Holiday's objection. 

 Before the jury, McLain examined the photos of Holiday's burns, confirmed that they
were burns, and testified that they appeared to be mainly second and some third degree burns. 
Pointing to individual photos, McLain opined as to which parts of Holiday's body were
closest to the fire based upon the location and severity of the burns. For instance, she pointed
out that there were no burns to Holiday's palm, but there were burns to the lower part of his
face and inside of the arm and wrist. Finally, McLain agreed that Holiday's burns, as
depicted in the photos, were consistent with a situation in which an accelerant had been
poured and the person reached down close to it with his right arm and it ignited. She also
testified that the burns shown in the photographs were consistent with burns from a flash fire
involving flammable vapors or flames from an ignitable liquid, and that the burns appeared
to be the result of close contact with a flame or fire.

 As stated previously, to establish the reliability of scientific evidence, the proponent
bears the burden of showing that (1) the underlying scientific theory is valid; (2) the
technique applying the theory is valid; and (3) the technique was properly applied on the
occasion in question. (44)

 McLain was a medical examiner who had conducted numerous autopsies on burn
victims. The testimony at issue was not highly technical or beyond the realm of general
medical knowledge based upon observation and some basic principles pertaining to burns to
the skin. The trial court was within the zone of reasonable disagreement in allowing McLain
to testify that Holiday's burns appeared to be consistent with having been caused by bending
down toward the ignitable substance. Point of error twenty-two is overruled.

Admission of Opinion Testimony - Dr. Al-Himyary

 In point of error twenty-six, Holiday claims that the trial court erred when it allowed
the opinion testimony of Dr. Ali Al-Himyary that Tierra had been sexually assaulted. At the
guilt phase, Wilkerson testified that one evening she discovered a pair of bloody panties
belonging to Tierra after Tierra had been alone with Holiday all day. Wilkerson also noticed
that the comforter and sheets from the bed had been washed, but Holiday denied washing
them. The next morning, Wilkerson took Tierra to be examined by Al-Himyary. Wilkerson
stated that after examining Tierra, Al-Himyary told her that it appeared that Tierra had been
raped. Holiday's objection to that statement as hearsay was sustained, and his request for an
instruction to disregard was granted. He moved for a mistrial, which was denied.

 In a hearing outside the presence of the jury Al-Himyary testified that he was a
licensed medical doctor and a pulmonologist critical-care specialist. He stated that he
examined Tierra and observed bleeding and multiple lacerations on both sides of her labia
minora. He further stated that the location of the injuries on the labia minora (on the inside),
as opposed to the labia majora (on the outside), indicated a penetration injury by a larger
object or organ, which caused the tearing and bleeding. He explained that these were not the
kind of injuries produced by an accidental fall or blunt trauma because, in that case, there
would have been injuries to the surrounding groin area as well, but there were none. Al-Himyary also doubted that the injuries were self-inflicted, as suggested by Holiday, "because
obviously it's very painful and it's multiple lacerations." Holiday objected to Al-Himyary's
testimony that Tierra was sexually assaulted as speculative and lacking scientific reliability. 
The trial court overruled the objections. 

 Al-Himyary testified before the jury that Wilkerson brought Tierra to his office in
early March of 2000, with concerns that Tierra had been sexually assaulted by Holiday. He
stated that Wilkerson was upset and Tierra was quiet and appeared to be distraught. Al-Himyary testified that his office was not equipped with a "rape kit" like those used by
emergency rooms in such circumstances, but he conducted a physical exam of Tierra. He
observed "lacerations and bleeding" on both sides of the labia minora and bruises on Tierra's
thighs. Al-Himyary informed Wilkerson that it was his conclusion that Tierra had been
sexually abused. He stated at trial that his opinion was based upon the nature of the injuries,
the fact that such injuries are not normal for a child of Tierra's age, and the information
provided by Wilkerson about the discovery of the bloody underpants, including her belief
that Tierra had been sexually abused. As required by law, Al-Himyary contacted CPS.

 The gist of Holiday's argument is that Al-Himyary's opinion lacked a scientific basis
because he did not have "actual knowledge of the source of the injuries." But "actual
knowledge" is not the test for reliability of scientific evidence and testimony. Al-Himyary's
opinion was not based upon an area of medical science that was highly technical or
theoretical. As he explained was typical with many diagnoses, he drew his conclusions from
the nature of the physical injuries presented and the circumstances surrounding the patient. 
As a medical doctor, he was qualified to do the physical examination of Tierra and make a
diagnosis, and he explained with clarity the basis for his opinion. Although Al-Himyary was
not an expert in sexual assault cases, his opinion was confirmed by another medical
professional who was. The trial court did not abuse its discretion in overruling Holiday's
objections to Al-Himyary's testimony. Point of error twenty-six is overruled.

Motion for Mistrial Based on the Admission of Hearsay Testimony from Wilkerson 

 In point of error twenty-seven, Holiday contends that the trial court should have
granted his motion for mistrial when Wilkerson testified that Dr. Ali Al-Himyary told her that
Tierra had been sexually assaulted. As discussed in the previous point of error, the trial court
sustained Holiday's objection and instructed the jury to disregard this statement. Such
instruction was sufficient to cure any error, particularly in light of the fact that Al-Himyary
himself testified to the same matter later. Point of error twenty-seven is overruled.

Trial Court's Comments on the Testimony of Dr. McLain

 In his twenty-first point of error, Holiday alleges that the trial court erred when it
commented on the testimony of Dr. McLain in the presence of the jury. During McLain's
testimony, the prosecutor showed her photographs of Holiday's burn injuries and asked
whether she could tell anything about the direction of the fire by looking at the pictures. 
Before McLain responded, and still within the presence of the jury, the following exchange
occurred:

 [DEFENSE COUNSEL]: Judge, I assume she is going to do more than
just answer yes to that question based upon the context of it so I'm going to
object on the basis of my objection outside the presence of the jury at the
Daubert-Kelly hearing.


 THE COURT: Just at the point you have established she has training,
of course, in victims who have been burned. [Sic].


 [PROSECUTOR]: Yes, Your Honor.


 THE COURT: And that have died as a result.


 [DEFENSE COUNSEL]: Judge, I object to the comment there as a
comment on the weight of the evidence. . . .


Responding to the objection out of the hearing of the jury, the judge stated that he was just
"tr[ying] to get caught up on where we were insofar as what he had asked for." McLain went
on to testify that Holiday's burns were consistent with his leaning down and starting the fire. 
Holiday argues that the court's comments allowed the jury to give credibility to McLain's
opinion testimony about the victims' causes of death and Holiday's location when the fire
started.

 Judges are required to refrain from making comments on the weight of the evidence
when ruling on its admissibility or from making any remark during trial that is calculated to
convey the judge's opinion of the case. (45) A comment amounts to reversible error if it is
reasonably calculated to benefit the State or prejudice the defendant. (46) 

 McLain's experience and training had been established and were not in question. The
judge's comment did not suggest anything about his view of McLain's testimony and was
not one which was calculated to benefit the State or prejudice the defendant. Point of error
twenty-one is overruled.

Admission of Evidence Pertaining to the Sexual Assault of Tierra

 In points of error twenty-three, twenty-four, and twenty-five, Holiday claims that the
trial court erred when it allowed evidence pertaining to his sexual assault of Tierra. As
discussed previously, the State presented evidence at the guilt phase that Holiday sexually
assaulted Tierra, that Wilkerson discovered this and brought charges against him, that
Holiday was forced to move out of the house he shared with Wilkerson, and that he was
indicted for the sexual assault and the case was pending at the time of the instant offenses. 
The State also presented evidence of the details of Tierra's injuries resulting from the assault. 
Holiday objected to the admission of the evidence and offered to stipulate to the fact that he
had been charged with the offense and to stipulate that Tierra suffered injuries consistent
with a sexual assault, in lieu of presentation of details regarding the offense and his
involvement. He also argued that admission of the evidence was more prejudicial than
probative. He reasserts these arguments on appeal.

 Evidence of other crimes, wrongs, or acts is generally inadmissible at guilt phase, but
Rule of Evidence 404(b) allows such evidence if it has relevance apart from character
conformity. (47) For instance, evidence of other crimes, wrongs, or acts may be admissible to
prove identity or intent, establish motive, or show opportunity or preparation. (48) Extraneous-offense evidence may also be admissible as same-transaction contextual evidence, where
"several crimes are intermixed, or blended with one another, or connected so that they form
an indivisible criminal transaction." (49)

 The admissibility of evidence, including extraneous-act evidence offered for a purpose
other than character conformity under Rule 404(b), is within the discretion of the trial court. 
As long as the trial court's ruling is within the zone of reasonable disagreement, the
reviewing court will affirm. (50) A trial court's decision not to exclude evidence, finding that
its probative value is not outweighed by the danger of unfair prejudice, is also given
deference. (51)

 The extraneous-act evidence here was offered primarily to show Holiday's motive in
the instant offense. Part of the State's theory of the case was that Holiday committed the
murders because he was very worried about the pending sexual assault charges, he did not
want to go to jail, and he was angry at Wilkerson for filing the charges and having him
removed from the house. Holiday told others that Wilkerson and her alleged boyfriend were
"setting him up" and were trying to take the children away from him, and he stated that he
was not going to "take the rap," suggesting that the sexual assault charges against him were
untrue. Although the sexual assault may not have been so intertwined with the murders as
to "form an indivisible criminal transaction," it was Wilkerson's discovery of Tierra's
injuries that set into motion Holiday's downward spiral that culminated in the murders. The
details of the sexual assault and the nature of Tierra's injuries were critical to an
understanding of the force behind Holiday's actions. The strength of the State's evidence
against Holiday on the sexual assault charges explains his motive for acting. 

 There is always a danger that admission of extraneous offenses, and particularly the
details of such offenses, may improperly divert the jury from the charges at hand or present
significantly more prejudice than evidentiary value. (52) But the evidence here was important
to understanding the context of and motivation behind Holiday's actions, and was not so
embellished or detailed as to become a diversion from the issues presented. Although the
evidence was highly prejudicial, it was also highly probative of the chain of events that drove
Holiday's actions in the instant case. (53) The trial court was not required to accept Holiday's
limited offers to stipulate; the court's decision to allow the evidence was within the zone of
reasonable disagreement. Points of error twenty-three though twenty-five are overruled.

Instruction on the Law of Parties

 In point of error twenty-eight, Holiday claims that the trial court erred in overruling
his objection to the jury charges for failing to instruct on the law of parties. The trial court
submitted three separate jury charges, one for each offense charged. The charges did not
include any instructions on the law of parties. Holiday objected and requested such charge. 
His objection was overruled. He contends that the evidence that Mitchell poured the gasoline
throughout the house raised the issue of parties.

 The evidence showed that Holiday terrorized Mitchell, Keller, and the three children
at gunpoint, made repeated threats of violence and murder, and randomly shot off the guns. 
At one point he held Mitchell in a head-lock with a gun to her head. He forced her into her
car to retrieve more gasoline and then ordered her to pour it around the house.

 Penal Code section 7.01, provides in part that "[e]ach party to an offense may be
charged with commission of the offense." (54) Mitchell was not a party because Mitchell could
not have been convicted of the offenses. Acting under duress and at gunpoint, she did not
possess the requisite mental state to be charged with the offenses. Because Mitchell was not
acting as a party within the meaning of party liability, the trial court did not err in overruling
Holiday's objections and denying his request. Point of error twenty-eight is overruled.

Motion for Mistrial Based on Comments by the Prosecutor 

about Holiday's Failure to Testify


 In his twenty-ninth point of error, Holiday claims that the trial court erred when it
failed to grant his motion for a mistrial for the prosecutor's comment on Holiday's failure to
testify. Holiday claims that the prosecutor repeatedly referred to Holiday's failure to testify
and points to the following five instances on voir dire:

 For instance, if I was charged with murder and the evidence showed that I shot
someone in the head three times, but at my trial I got up and testified, well-- 


 * * *


 Now, I want to talk to you a little bit just about what is not in dispute in this
trial. What we believe based on the evidence is not in dispute at this trial.


 * * *


 I don't think there is any dispute that the defendant is involved in this case.


 * * *


 There is no dispute that there were three children killed here which means two
or more people-- 


 * * *


 We also know that when he was outside with Terry and Beverly and the kids
and he was ranting and raving and shooting off the gun and burning things on
the ground and lighting fires and scaring everyone half to death, that what he
said as the reason he was out there was I'm not going to take the rap on these
rape charges. I'm not going to do it. I'm going to take care of it tonight. I'm
going to burn the house down with everyone in it. That's what he said. Those
statements have not been refuted and there has been no attempt-- 


 A prosecutor's comment on a defendant's failure to testify violates the defendant's
Fifth Amendment right against compelled self-incrimination. (55) The comment must clearly
refer to the defendant's failure to testify; it is not sufficient if it "might be construed as an
implied or indirect allusion." (56) The "test is whether the language was manifestly intended
or was of such a character that the jury would necessarily and naturally take it as a comment
on the defendant's failure to testify." (57) 

 The first complained-of statement was made during an attempt by the prosecutor to
explain a situation where the evidence might raise a question of a lesser-included offense so
that a charge on the lesser offense would be submitted. Holiday's objection to the statement
as a comment on his failure to testify was sustained, and an instruction to disregard was
given. The statement referred to a situation in which a hypothetical defendant had testified. 
Even if it could be construed as an indirect allusion to Holiday's failure to testify, it was not
manifestly intended to be a comment on Holiday's failure to testify, nor would the jury
necessarily and naturally take it that way.

 The second, third, and fourth complained-of statements made no direct, or even
implied, reference to Holiday's failure to testify. A reference to evidence that is "not in
dispute" does not necessarily suggest a failure by the defendant to testify. There are many
ways to dispute evidence besides testimony by the defendant, such as cross-examination and
presenting contrary evidence and other witnesses. Any failure of the trial court to rule in
Holiday's favor regarding his objection to these statements was not an abuse of discretion. (58)

 When the prosecutor made the fifth complained-of comment that certain of Holiday's
out-of-court statements had not been refuted, the trial court sustained Holiday's objection and
instructed the jury to disregard the comments. Holiday's motion for mistrial was denied. To the extent that these comments could be construed as referring to Holiday's failure
to testify, the court's instruction to disregard cured any error. (59) Point of error twenty-nine
is overruled.

Personal Opinion Statement Made by the Prosecutor

 In point of error thirty, Holiday claims that the trial court erred when it overruled his
objections to the prosecutor inserting his personal opinions into the argument. Holiday
complains about the following statement made by the prosecutor during closing arguments:

 The fact that you're given lesser included offense to consider, that is not in any
way a concession by the State that that is what we think this case is about. 
Clearly we believe this is a capital murder case. We always have.


A prosecutor may argue his opinions concerning issues in the case so long as the opinions
are based on the evidence in the record. (60) The prosecutor's statement that the State believed
"this is a capital murder case" and not a lesser-included offense was a direct reference to
what the prosecutor thought the evidence would support. The prosecutor was simply stating
that he believed the evidence would support convictions for the offenses charged, capital
murder. This is not improper. Point of error thirty is overruled.

Admission of Expert Testimony - Dr. Gripon

 In point of error thirty-one, Holiday claims that the trial court erred when it allowed
Dr. Edward Gripon to testify that it was more likely than not that Holiday would commit
future acts of criminal violence. Holiday contends that Gripon was not qualified to make
such prediction, that Gripon did not establish that he used a valid scientific theory or a theory
accepted as valid within the scientific community, that Gripon's techniques and theories were
not supported by an identified potential rate of error, and that Gripon did not have a sufficient
factual basis for his opinion.

 The trial court held a Kelly/Daubert hearing regarding Gripon's testimony. Gripon,
a psychiatrist, testified that he graduated from medical school in 1968, and that he is board-certified in psychiatry and in the subspecialty of forensic psychiatry. In his work in forensic
psychiatry, Gripon has evaluated more than seven thousand criminal defendants on the issues
of their competency or sanity at the time of the offense. He has also evaluated defendants
on their competence to stand trial or to be executed. Gripon agreed that, in making such
evaluations, he sometimes refers to psychological testing information or resources, and that
he sometimes conducts clinical interviews. He stated that psychiatry is a valid science,
although, like all sciences, its knowledge base is constantly evolving. Forensic psychiatry
is a subspecialty of psychiatry recognized by the American Board of Psychiatry and
Neurology. Gripon stated that he has testified on these issues in many court cases in Texas
as well as in cases in Missouri, New Mexico, Louisiana, the federal system, and at a war-crime tribunal in the Hague.

 Gripon testified that there are a number of acceptable methods of assessing future-
dangerousness that are considered to have a valid scientific basis. For simplification, he
identified and described three: (1) the pure clinical model; (2) a clinical approach that
includes consideration of certain demographic and actuarial information; and (3) the pure
actuarial model. Gripon stated that his approach falls within the second model. Mental
health history, past behavioral history, and demographics are all important in making such
assessment. He stated that the more factors and information considered, the more reliable
the opinion. This is the technique he employed in Holiday's case. Gripon testified that
making predictions about whether a person is more likely than not to commit acts of violence
in the future was within his field of expertise. He based his opinion in Holiday's case on
offense reports, school records, historical information regarding reports of past behavior,
psychological testing, psychological profile, and the testimony of the defense psychiatric
expert witness. He testified that he did not interview Holiday, but also stated that an opinion
based upon collateral information and hypotheticals, absent a personal interview, was
nonetheless accepted as valid.

 On cross-examination, Gripon further explained the clinical/demographic approach
as a combination of evaluating the presence of mental illness issues and taking into account
other factors such as educational level, family support systems, and age. Age was the
primary demographic factor considered by Gripon; he considered educational level and
family support systems to be less significant. Gripon stated that most actuarial studies show
that most people fall below the probability of being a future danger. He agreed that the
position of the American Psychiatric Association was that psychiatrists are not better
qualified than anyone else to make predictions about future danger in capital murder cases. 
Gripon stated that he had not done any studies to determine if his predictions were reliable
because "it is proven to be impossible to date to do any kind of study that will either validate
or invalidate that issue." In Gripon's opinion, the actuarial studies on the issue are not
accurate because of the lack of controls and immeasurable variables.

 The trial court overruled Holiday's many objections to Gripon's testimony. In the
presence of the jury Gripon explained that, while the majority of mental illnesses are
considered treatable, others -- e.g., maladaptive personality disorders -- are very difficult
to treat or are even untreatable. Gripon concluded that Holiday has an antisocial personality
disorder, that the chances of improvement over time were minimal, and that he would more
likely than not be a future danger:

 That he would potentially, on the level of more likely than not, given the
history of antisocial personality and the clear history of escalation of violent
behavior, culminating in committing capital murder, that it would be more
likely than not.

 

 In Russeau v. State, the defendant claimed that the trial court erred in admitting the
expert testimony of a psychologist and a psychiatrist on the issue of his future-dangerousness. (61) We reiterated the standard for assessing admissibility of expert testimony
in the "soft sciences":

 "When addressing fields of study aside from the hard sciences, such as the
social sciences or fields that are based primarily upon experience and training
as opposed to the scientific method, Kelly's requirement of reliability applies
but with less vigor than to the hard sciences." Nenno v. State, 970 S.W.2d 549,
561 (Tex. Crim. App. 1998). When "soft" sciences are at issue, the trial court
should inquire: (1) whether the field of expertise is a legitimate one, (2)
whether the subject matter of the expert's testimony is within the scope of that
field, and (3) whether the expert's testimony properly relies on or utilizes the
principles involved in the field. (62)


 The trial court was within the zone of reasonable disagreement in holding that the
State had met its burden of establishing Gripon's qualifications and the reliability of his
testimony. As a board-certified psychiatrist with years of experience and specializing in
forensic psychology, Gripon was shown to be qualified. While making predictions about
future behavior is controversial among psychiatrists, forensic psychiatry is a legitimate and
recognized field by the American Psychiatric Association. Gripon testified that his method
of assessing future-dangerousness was considered valid. While Holiday points to issues that
were legitimate areas for cross-examination, his objections went to the weight and not the
admissibility of Gripon's testimony. Point of error thirty-one is overruled.

Exclusion of Testimony from Reverend Pickett

 In points of error thirty-two, thirty-three, thirty-four, and thirty-five, Holiday claims
that the trial court erred when it refused to allow the testimony of Reverend Carol Lamar
Pickett. At the punishment phase of the trial, Holiday attempted to present Pickett's
testimony regarding how the death penalty is carried out, how it affects those who assist in
carrying it out, and how it affects the families of the crime victims. He also attempted to
offer Pickett's testimony that many inmates serving long prison terms make positive changes
in their lives. The State's objection to the testimony as irrelevant to any punishment issue
was sustained. Holiday perfected a bill of exceptions. Holiday argues that the testimony was
relevant because he was allowed to offer any evidence that might justify a life sentence rather
than a death sentence.

 On appellate review, a trial court's admission or exclusion of evidence is subject to
an abuse of discretion standard. (63) If the trial court's decision is within the bounds of
reasonable disagreement, the reviewing court will not disturb its ruling. (64) Relevant evidence
is "evidence having any tendency to make the existence of any fact that is of consequence
to the determination of the action more probable or less probable than it would be without
the evidence." (65) The mitigation issue submitted to the jury in Holiday's case asked whether 

 [t]aking into consideration all of the evidence, including the circumstances of
the offense, the defendant's character and background, and the personal moral
culpability of the defendant, . . . there is a sufficient mitigating circumstance
or circumstances to warrant that a sentence of life imprisonment rather than a
death sentence be imposed.


 The jury was also instructed that a mitigating circumstance "may include, but is not limited
to, any aspect of the defendant's character, background, record, emotional instability,
intelligence or circumstance of the crime which you believe could make a death sentence
inappropriate in this case.

 Pickett's testimony was not offered to provide the jury with information regarding
Holiday or the circumstances of his case in particular. His testimony pertained solely to how
others in the criminal justice system are affected by the carrying out of executions. The trial
court did not abuse its discretion in concluding that such evidence is not relevant mitigating
evidence and is not helpful to the jury in making "an individualized assessment of the
appropriateness of the death penalty." (66) Even if Pickett's testimony could be viewed as
marginally relevant, the trial court was within its discretion to exclude it under Rule 403. (67) 
Because the evidence was not particularized to the defendant, the trial court might reasonably
conclude that the risk of confusing and distracting the jury substantially outweighed any
probative value such evidence might have. (68) Points of error thirty-two through thirty-five are
overruled.

Limitation on the Cross-Examination of Mitchell at Punishment

 In his thirty-sixth point of error, Holiday claims that the trial court erred when it
improperly limited his examination of Beverly Mitchell at punishment. At the guilt phase,
Mitchell testified that she saw Holiday bend down and then the fire started. She stated that
she never saw a match or lighter, but the fire started immediately as Holiday reached down
with his right hand, and it started at the place where he was bending over. On cross-examination, Mitchell agreed that she did not say anything about having seen Holiday
bending down when the fire started, either in testimony she gave at a pretrial hearing or in
the statement she gave to police the morning after the fire. During his closing argument at
the guilt phase, the prosecutor suggested that Mitchell did not mention seeing Holiday
bending over in her statement or pretrial testimony because she was not asked that question.

 Holiday called Mitchell as a witness at punishment. Defense counsel asked Mitchell
about the first statement she gave to police after the fire, emphasizing that it was a narrative
statement in which she said nothing about observing Holiday bending over to light the fire:

 [DEFENSE COUNSEL] [Y]ou write that you poured on Tami's bid [sic] and
you ran out of gas, that one container?


 [MITCHELL] Uh-huh.


 Q And I was fixing to go check on the girls, the gas exploded?


 A Yes. That's what I wrote.


 Q Okay. And that's not out of context or anything is it?


 A No, sir.


 Q That's - you didn't say anything about seeing [Holiday] or seeing anybody
bend down or seeing anyone standing. That's just what you wrote at the time?


 A Yes, sir.


Defense counsel then questioned Mitchell about a question and answer interview she had
with authorities several days later. Defense counsel read a portion from a transcript of that
interview in which Mitchell described what happened when the fire started. She agreed that
she did not mention anything about Holiday bending down right before or at the start of the
fire, and that counsel was not taking her statements out of context. Before defense counsel
could question her further, the State objected to the line of questioning as repetitive of guilt
phase testimony. Defense counsel argued it was necessary to clear up the implication that
Mitchell did not say anything about Holiday bending over simply because she was not asked
the right question. The State's objection was sustained, and defense counsel made a bill of
exceptions in which he questioned Mitchell about her pretrial testimony, reading the relevant
questions and answers to try to make the point that Mitchell was asked questions to which
such an answer would have been appropriate. Holiday argues that this testimony was
relevant to mitigation because it pertained to an important circumstance of the offenses,
whether Holiday ignited the fire, and he was entitled to clear up the false impression created
by the prosecutor in his argument at the guilt phase.

 Mitchell had already responded to numerous pointed questions from defense counsel
regarding the context in which her earlier statement and testimony were made. The trial
court did not abuse its discretion in limiting continued questioning of Mitchell on an issue
on which there had already been considerable testimony. (69) Point of error thirty-six is
overruled.

Constitutionality of Article 37.071

 In point of error thirty-eight Holiday claims that Article 37.071 is unconstitutional
because it impermissibly limits mitigating evidence to only that evidence which the jury
might regard as reducing moral blameworthiness. In his thirty-ninth point of error, Holiday
claims that the 12-10 rule in Article 37.071 is unconstitutional. In his fortieth point of error
Holiday claims that Article 37.071 is unconstitutional because it prohibits informing jurors
of the effect of their failure to agree in answering the special issues. In points of error forty-one and forty-two Holiday claims that Article 37.071 is unconstitutional because it does not
place a burden of proof on the State on the mitigation issue, and implicitly places a burden
on the defendant, in violation of Ring v. Arizona. (70) In his forty-third point of error, Holiday
claims that Article 37.071 is unconstitutional for its failure to define the terms "probability,"
"sufficient mitigating circumstances," "personal moral culpability," and "moral
blameworthiness." In his forty-fourth point of error Holiday complains that Article 37.071
fails to provide for meaningful appellate review of the mitigation issue. In points of error
forty-five, forty-six, and forty-seven, Holiday contends that the trial court erred in overruling
his objection to the failure of the court's punishment charge to define the term "probability,"
his objection to the failure of the punishment charge to define "criminal acts of violence" and
his objection to the failure of the charge to define "continuing threat to society." In his forty-eighth point of error Holiday contends that the trial court violated Ring v. Arizona when it
overruled Holiday's objection to the punishment charge for its failure to place the burden on
the State to prove beyond a reasonable doubt that there was not sufficient mitigating evidence
to warrant a life sentence. In point of error forty-nine, Holiday claims that the trial court
erred by failing to define the terms "probability," "criminal acts of violence," and
"continuing threat to society" in the punishment charge. 

 This Court has repeatedly addressed and rejected claims identical to those raised in
points of error thirty-eight, (71) thirty-nine, (72) forty, (73) forty-one, (74) forty-two, (75) forty-three, (76) forty-four, (77) forty-five, (78) forty-six, (79) forty-seven, (80) forty-eight, (81) and forty-nine. (82) These points of
error are overruled.

 The judgments of the trial court are affirmed.


Delivered: February 8, 2006

Do not publish
1. Tex. Pen. Code Ann. § 19.03(a). Holiday was charged in three separate indictments, each
alleging the capital murder of a different named individual. The cases were tried together, but the
jury was submitted a separate charge for each case, and three separate judgments were rendered. 
2. Art. 37.071 § 2(g). Unless otherwise indicated, all references to Articles refer to the
Texas Code of Criminal Procedure.
3. Art. 37.071 § 2(h). 
4. See Jackson v. Virginia, 443 U.S. 307 (1991). 
5. Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004).
6. Id.
7. Manns v. State, 122 S.W.3d 171, 193 (Tex. Crim. App. 2003).
8. 469 U.S. 412 (1985).
9. Id. at 433.
10. Id.
11. Colburn v. State, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998).
12. Cantu v. State, 842 S.W.2d 667, 681 (Tex. Crim. App. 1992)
13. Colburn, 966 S.W.2d at 517. 
14. 541 U.S. 36 (2004).
15. Chapman v. California, 386 U.S. 18, 24 (1967).
16. Art. 1.14(b).
17. State v. Moff, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). 
18. Id.
19. Id.
20. See id. at 601-02. 
21. Williams v. State, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996); Draughon v. State, 831
S.W.2d 331, 337-38 (Tex. Crim. App. 1992). 
22. 878 S.W.2d 142, 148 (Tex. Crim. App. 1992).
23. Id.
24. Murphy v. State, 112 S.W.3d 592, 600-601 (Tex. Crim. App. 2003).
25. Id.
26. See Howard v. State, 941 S.W.2d 102, 129 (Tex. Crim. App. 1996).
27. Id.
28. Tex. R. App. P. 33.1.
29. Id.
30. 740 S.W.2d 453 (Tex. Crim. App. 1987) (plurality opinion).
31. Id. at 460.
32. Johnson v. State, 698 S.W.2d 154, 167 (Tex. Crim. App. 1985).
33. Menefee v. State, 614 S.W.2d 167 (Tex. Crim. App. 1981).
34. See Cain v. State, 947 S.W.2d 262, 264 (Tex. Crim. App.1997) (holding that "[e]xcept
for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,'
no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory
requirement, is categorically immune to a harmless error analysis").
35. Tex. R. App. P. 44.2(b).
36. Johnson v. State, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001).
37. Herring v. State, 147 S.W.3d 390, 397 (Tex. Crim. App. 2004) (citing Johnson v. State,
967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).
38. Sexton v. State, 93 S.W.3d 96, 99-100 (Tex. Crim. App. 2002); Kelly v. State, 824 S.W.2d
568, 573 (Tex. Crim. App. 1992).
39. Id. at 100.
40. Id.
41. Id.
42. See Jordan v. State, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996) (holding that failure
of expert on eyewitness identification to take into account certain facts is matter of weight and
credibility, not admissibility).
43. See id.
44. Sexton, 93 S.W.3d at 100.
45. Art. 38.05.
46. Moody v. State, 827 S.W.2d 875, 879 (Tex. Crim. App. 1992); Davis v. State, 651
S.W.2d 787, 790 (Tex. Crim. App. 1983).
47. Moses v. State, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). 
48. Id.
49. Prible v. State, 175 S.W.3d 724, 731 (Tex. Crim. App.), cert. denied, 126 S. Ct. 481
(2005).
50. Id.
51. Id.
52. Id.
53. Tex. R. Evid. 403.
54. Tex. Pen. Code § 7.01(b).
55. Canales v. State, 98 S.W.3d 690, 695 (Tex. Crim. App. 2003).
56. Id.
57. Id.
58. See Hammond v. State, 799 S.W.2d 741, 747-48 (Tex. Crim. App. 1990) (holding
prosecutor's argument to jury, "[Y]ou heard no controversy. You heard no other version" was not
necessarily a comment on defendant's failure to testify and to extent that it was, court's instruction
to disregard cured error).
59. See id.
60. Barnard v. State, 730 S.W.2d 703 (Tex. Crim. App. 1987). 
61. 171 S.W.3d 871, 883 (Tex. Crim. App. 2005).
62. Id.
63. Sells v. State, 121 S.W.3d 748, 766 (Tex. Crim. App 2003).
64. Id.
65. Tex. R. Evid. 401.
66. See Canales, 98 S.W.3d at 699.
67. Tex. R. Evid. 401.
68. See Sells, 121 S.W.3d at 766; Rachel v. State, 917 S.W.2d 799, 817-18 (Tex. Crim. App.
1996).
69. See Carroll v. State, 916 S.W.2d 494, 498 (Tex. Crim. App. 1996).
70. 536 U.S. 584 (2002)
.
71. See Prystash v. State, 3 S.W.3d 522, 534-35 (Tex. Crim. App. 1999).
72. Feldman v. State, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002).
73. Brooks v. State, 990 S.W.2d 278, 288 (Tex. Crim. App. 1999).
74. Resendiz v. State, 112 S.W.3d 541, 550 (Tex. Crim. App.), cert. denied, 541 U.S. 1032
(2004).
75. Id.
76. Blue v. State, 125 S.W.3d 491, 505 (Tex. Crim. App. 2003), cert. denied, 125 S.Ct. 297
(2004).
77. Prystash, 3 S.W.3d at 536. 
78. Ladd v. State, 3 S.W.3d 547, 572-73 (Tex. Crim. App. 1999).
79. Id.
80. Id.
81. Resendiz, 112 S.W.3d at 551.
82. Ladd, 3 S.W.3d at 572-73.